1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    WENDY WALSH, et al.,

                                             Case No. 1:11-cv-01489 LJO JLT

12              Plaintiffs,
                                             ORDER RE: DEFENDANTS' MOTION FOR
                                             SUMMARY JUDGMENT

13         v.

14    TEHACHAPI UNIFIED SCHOOL                (Doc. 46)
      DISTRICT, et al.,

15

16              Defendants.

17    _____/

18         Pending before the Court is Defendants Tehachapi Unified School District ("School District"),

19    Susan Ortega ("Ms. Ortega"), and Paul Kaminski's ("Mr. Kaminski's") (collectively "Defendants'")

20    motion for summary judgment.  Plaintiffs Wendy Walsh ("Ms. Walsh") and her minor son ("Sh. W.")

21    (collectively "Plaintiffs") have filed an opposition to the motion, and Defendants have filed a reply.  In

22    addition, the parties have filed supplemental briefing upon the Court's request.  Having considered all

23    the parties' submissions, and for all the reasons discussed below, the Court GRANTS IN PART and

24    DENIES IN PART Defendants' motion for summary judgment.

25    I.     BACKGROUND

26           A.     Factual Background

27           This case concerns the suicide of a 13-year-old boy ("Decedent") in September 2010, allegedly

28    because he was harassed at school for being gay.  The plaintiffs in this case are Ms. Walsh, who is the

mother and successor in interest of Decedent, and Sh. W., Decedent's younger brother.  The following facts are undisputed for the purposes of this motion.

On September 19, 2010, Ms. Walsh and Sh. W. drove to a park in Tehachapi, California to pick up Decedent.  When Ms. Walsh and Sh. W. arrived, four kids appeared to be harassing Decedent.  Ms. Walsh honked at the kids and "had words with them."  She stated that she should call the police; that what they were doing was a hate crime; that they should be ashamed of themselves; and that they should pick on someone their own size.

On the drive home, Ms. Walsh asked Decedent if he was okay, to which Decedent responded that he was "all right."  When they returned home, Decedent declined to talk with Ms. Walsh about what had happened at the park and went to take a shower.  Ms. Walsh, in turn, resumed work on her computer and listened to music in her room, while Sh.W. went to his sister's room to play games on a computer there.

Later that afternoon, Sh. W. heard Decedent say from the backyard, "Hey, [Sh. W.] look."  The room that Sh. W. was in had windows facing the backyard, and the windows were open that afternoon.  Sh. W. looked outside and saw Decedent using a belt that he held in both hands to swing on a tree in the backyard.  Decedent appeared to be happy and having fun swinging on the tree.  Sh. W. went back to playing games on the computer.

Less than 10 minutes later, Ms. Walsh walked into the backyard, saw Decedent by the plum tree with a ladder nearby, and started talking to him.  At that point, Ms. Walsh did not think anything was unusual and was under the impression that Decedent was picking plums from the tree.  Seconds later, however, Ms. Walsh realized that Decedent's shirt was pulled up over his head, that Decedent's feet were not touching the ground, and that Decedent was hanging from the tree by a brown extension cord.  Decedent was not moving.

Ms. Walsh ran up to Decedent, grabbed him in an effort to keep him from choking, and started screaming for Sh. W.  Sh. W. looked out the window and saw Ms. Walsh holding something.  Sh. W. could tell it was a human body, but could not tell that it was Decedent.   Sh. W. ran out to the backyard where Ms. Walsh told Sh. W. to grab scissors.  Sh. W. went back into the house, retrieved a knife from the kitchen, and returned to the backyard.  Sh. W. then climbed the ladder and cut down the extension

1  cord without hesitation.

2        After the extension cord was cut, Ms. Walsh was initially able to hold onto Decedent and keep

3  her balance.  But soon after, while Sh.W. was still on the ladder, Ms. Walsh accidentally dropped the

4  body onto the dirt ground.  When the body fell to the ground, Decedent's shirt fell perfectly around his

5  shoulders and revealed his face.  This was the first time Sh. W. actually realized that the hanging body

6  was that of his older brother.  Decedent's eyes were fixed and staring into space, and his tongue was

7  swollen and blue.

8         Nervous and scared, Ms. Walsh and Sh. W. ran into the house.  Ms. Walsh called 9-1-1, and

9  emergency personnel arrived within two minutes.  Ms. Walsh and Sh. W. remained in the house while

10  emergency personnel tended to Decedent.  Although Ms. Walsh and Sh. W. did not see the paramedics

11  treat Decedent, they did see the paramedics carry Decedent away in a stretcher.  Ms. Walsh believed

12  that Decedent was dead.

13        Later that night, Ms. Walsh found suicide notes in the garage that were written by Decedent.

14  One of the notes read:

15  
16  > Wendy, Mom, . . . , I love you.  Thank you for having me.  It's been a pleasure.  I know
> this will bring much pain.  But, I will hopefully be in a better place than this shit hole.
> Please, put my body in burial, and visit my used body.  And make sure to make the
17  > school feel like shit for bringing you this sorrow.  This life was a pleasure, mostly
> having you guys to pull me through the pain.  Hopefully I become the universe,
> [Decedent].  Phone 0000.  IPod code 0000.

18  

19  Ms. Walsh and Sh. W. were both aware that Decedent had been harassed at school.  However, prior to

20  the events of that day, Ms. Walsh never noticed any signs of mental illness by Decedent.  Nor was she

21  ever concerned that Decedent was suicidal.

22        Decedent never regained consciousness.  On September 27, 2010, a little over a week after the

23  apparent suicide attempt, Decedent was declared brain-dead and Ms. Walsh elected to remove all life

24  support from Decedent.  Decedent's death certificate listed his causes of death as hanging and anoxic

25  brain injury.

26      **B.**    **Procedural History**

27        Plaintiffs first filed suit in Kern County Superior Court.  The action was then removed to this

28  Court on September 2, 2011.  The action is now proceeding on Plaintiffs' second amended complaint

on the following seven causes of action: (1) failure to prevent student-on-student harassment based on sex or sexual orientation in violation of Title IX of the Education Amendments of 1972 ("Title IX"); (2) denial of equal protection in violation of the Fourteenth Amendment; (3) deprivation of familial relations in violation of the First and Fourteenth Amendment; (4) violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 and 51.5; (5) negligence; (6) wrongful death; and (7) negligent infliction of emotional distress to a bystander.

Defendants filed the instant motion for summary judgment on June 7, 2013.  Defendants seek summary judgment on Ms. Walsh's and Sh. W.'s claims for negligent infliction of emotional distress to a bystander.[1]  Plaintiffs filed an opposition to the motion on July 11, 2013, and Defendants filed a reply on July 16, 2013.

Further, the Court, prompted by the parties' arguments made in connection with Defendants' motion for summary judgment, raised the issue of proximate cause, specifically whether Plaintiffs had sufficient evidence to establish proximate cause between Defendants' alleged negligent conduct and Decedent's act of suicide.  Plaintiffs filed briefing on the issue on July 30, 2013, and Defendants filed a response on August 2, 2013.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party."  Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317,

---

[1] Sh. W.'s only claim against Defendants is his claim for negligent infliction of emotional distress to a bystander.

323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); Cecala v. Newman, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party."  Soremekun, 509 F.3d at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  Id. (citing Celotex, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor."  FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard.  Id. at 929.  See also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence."  Soremekun, 509 F.3d at 984.  That remains the province of the jury or fact finder.  See Anderson, 477 U.S. at 255.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Id.  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## III.   DISCUSSION

Defendants seek summary judgment on Plaintiffs' respective claims for negligent infliction of emotional distress to a bystander.  In Thing v. La Chusa, 48 Cal. 3d 644, 667-68 (1989), the California

5

Supreme Court established three requirements that a plaintiff must satisfy before recovering on a claim for negligent infliction of emotional distress to a bystander: (1) the plaintiff must be closely related to the injury victim; (2) the plaintiff must have been present at the scene of the injury-producing event at the time it occurred and was then aware that it was causing injury to the victim; and (3) as a result, the plaintiff must have suffered serious emotional distress.  At issue here is the second <u>Thing</u> requirement. Defendants argue that Plaintiffs cannot satisfy this requirement because (a) Plaintiffs were not present at the injury-producing event when it occurred; (b) Sh. W. was not aware during the injury-producing event that the victim was his older brother; and (c) Plaintiffs were not aware at the time of the injury-producing event of any causal connection between Decedent's act of suicide and Defendants' alleged negligent conduct.  Each argument is discussed below.

### A.      Present at the Injury-Producing Event

Defendants identify Decedent's act of hanging as the injury-producing event.[2]  Defendants also characterize the hanging as a momentary event in which Decedent's injuries and suffering began when he stepped off the ladder, and ended once the extension cord noose became taut and stopped his fall. In other words, Defendants contend that the injury-producing event was nearly instantaneous and was, at the very latest, complete once Defendant was fully suspended in the air and held upright solely by the tension and force of the noose.

With this characterization of the injury-producing event in mind, Defendants maintain that Ms. Walsh and Sh. W. cannot satisfy the second <u>Thing</u> requirement because neither of them was present at the injury-producing event when it occurred.  Defendants stress that Plaintiffs discovered Decedent only after Decedent had been hanging for some time;[3] when Ms. Walsh and Sh. W. found Decedent he was already fully suspended in the air, was held upright solely by the force of the noose, and was not moving.  Thus, in Defendant's view, Plaintiffs were not present at the injury-producing event *when it occurred*; rather, in Defendants' opinion, Plaintiffs only observed the hanging's *aftermath*, which does

---

[2] Plaintiffs generally agree that the Decedent's hanging forms the basis of the injury-producing event. Therefore, the Court will assume for the purposes of this motion that the injury-producing event began with Decedent's hanging.

[3] There is no evidence, medical or otherwise, establishing how long Decedent had been hanging.

1  not suffice under <u>Thing</u>.

2      Defendants analogize this case to <u>Hathaway v. Superior Court</u>, 112 Cal. App. 3d 728 (Ct. App.

3  1980).  In <u>Hathaway</u>, a six-year-old boy was electrocuted when he touched a cooler that was recently

4  installed outside the house.  The boy's parents did not witness the electrocution since they were inside

5  the house at the time.  <u>Id.</u> at 730-31.  The boy's parents rushed outside to the cooler a minute later only

6  after another child ran into the house and indicated that something was wrong with the boy.  <u>Id.</u> at 731.

7  When the boy's parents found their son, he was alive, albeit lying in a puddle of water near the cooler

8  gagging.  <u>Id.</u>  The boy eventually died, however, as the process of electrical shock ran its course and

9  interfered with the functioning of the boy's heart.  <u>Id.</u>

10     Under these circumstances, the appellate court held that the boy's parents could not recover for

11 negligent infliction of emotional distress to a bystander.  The court reasoned, essentially, that the boy's

12 parents were not present at the scene of the injury-producing event *when it occurred*; rather, the boy's

13 parents arrived at the scene of the accident only *after it was complete* and only observed the aftermath

14 of the injury-producing event:

15     [When the boy's parents discovered their son, he] was no longer gripping the water
       cooler and receiving the electrical charge.  The event which constituted the accident
16     had ended.  It is uncontradicted that [the boy's parents] did not sensorially perceive the
       injury-causing event, that is, the actual contact between the electrically charged water
17     cooler and [their son], but saw only the results of the contact (the injuries) after the
       accident was over.

18

19 <u>Id.</u> at 736 (parenthesis in original).

20     Defendants' attempt to analogize the events of this case to <u>Hathaway</u> is not persuasive.  The

21 injury-producing event in <u>Hathaway</u> was a discrete event that began when the boy touched the cooler

22 and ended once he released it.  It was also clear in <u>Hathaway</u> that the boy's parents arrived at the scene

23 of the accident only after the boy had released the cooler and therefore after the injury-producing event

24 was over.  Here, in contrast, Decedent was still hanging when Plaintiffs discovered him.  Although he

25 was unconscious and not moving, Decedent was still alive.[4]  Therefore, in the absence of any medical

26

27 ─────────────────────
   [4] As indicated above, Decedent was declared deceased only after Ms. Walsh decided to terminate life
28 support for Decedent a week later.  Decedent's causes of death were listed as hanging and anoxic brain
   injury (brain damage as a result of oxygen deprivation).

7

1   evidence showing otherwise, it appears that the noose and act of hanging continued to inflict injury on

2   Decedent by way of physical strangulation and asphyxiation since the noose remained taut and affixed

3   around Decedent's neck.[5]

4           Where, as here, the plaintiff arrives at the scene of the injury-producing event while it is still

5   ongoing (i.e., the incident is still inflicting injury on the victim), the plaintiff satisfies the requirement

6   that she be "present at the scene of the injury-producing event at the time it occurred." Thing, 48 Cal.

7   3d at 668.  For example, in Ortiz v. HPM Corp., 234 Cal. App. 3d 178 (Ct. App. 1991), the plaintiff

8   discovered her husband trapped in a plastic injection molding machine.  Id. at 182.  The machine was

9   still running and continued to press against her husband's chest.  Id.  Her husband did not appear to be

10  breathing and his body was limp.  Id.  In these circumstances, the appellate court held that the plaintiff

11  could recover for negligent infliction of emotional distress to a bystander despite the fact that she did

12  not witness her husband's initial fall into the machine.  The court explained that while a plaintiff may

13  not recover if she arrives at the scene of an accident *after it is already complete*, nothing precludes her

14  from recovering if she arrives *while the accident is still ongoing*.  See id. at 185.  The court concluded

15  that this case presented the latter situation since the plaintiff arrived at the scene of the accident while

16  the machine was still running and injuring her husband.  Id.

17          This case is indistinguishable from Ortiz.  While Plaintiffs did not witness Decedent step off

18  the ladder and did not observe the initial impact of the hanging, Plaintiffs did discover Decedent while

19  the noose was still taut around his neck and, presumably, still inflicting injury on him.  Therefore, like

20  the plaintiff in Ortiz who found her unconscious husband still being pressed and injured by the plastic

21  injection molding machine, Plaintiffs discovered Decedent at a time when the injury-producing event

22  was still ongoing.  This is sufficient to satisfy the requirement that Plaintiffs be present at the scene of

23  the injury-producing event.  Id. at 186.

24

_____

25  [5] The Court's analysis would be different, for example, if there had been medical evidence indicating

26  that Decedent was already dead or brain-dead at some point before Plaintiffs' discovery of Decedent.
    There is, however, no evidence to that effect in the current record.

27  With that said, Defendants may still prevail on this issue at trial if there is uncontradicted medical
    evidence that Decedent was already dead before Plaintiffs discovered him or if the jury otherwise

28  finds that such was the case.

**B.      Aware That the Victim Is a Family Member**

Defendants argue that even if Sh. W. was present at the scene of the injury-producing event, he does not satisfy the second <u>Thing</u> requirement because he did not know that the hanging body was his older brother until after the injury-producing event had already ended.  Defendants highlight Sh. W.'s deposition testimony in which he indicated that the first time he realized that the hanging body was his older brother was after Decedent had already been cut down from the tree and was lying on the ground with his shirt no longer covering his face.

"[<u>Thing</u>] makes it clear that recovery for [negligent infliction of emotional distress] is possible only if [the] plaintiff is present at the scene of an accident and *is then aware* a family member is being injured."  <u>Fife v. Astenius</u>, 232 Cal. App. 3d 1090, 1093 (Ct. App. 1991) (emphasis in original).  For example, in <u>Fife</u>, a woman was involved in a vehicle collision directly behind her house.  <u>Id.</u> at 1092.  Her father and brothers, who were in the house at the time of the collision, did not see the accident but heard the crash and saw debris fly through the air.  <u>Id.</u>  The father and brothers immediately ran out of the house to the scene of the accident where they found their daughter/sister injured in her car.  <u>Id.</u>  In these circumstances, the appellate court concluded that the father and brothers could not recover for negligent infliction of emotional distress as bystanders because they did not know that the victim was their daughter/sister *at the time of the collision*.  <u>Id.</u> at 1093.  Although the father and brothers learned the actual identity of the victim just "minutes or even seconds" after the collision took place, that was insufficient under <u>Thing</u>.  <u>Fife</u>, 232 Cal. App. 3d at 1093.

The critical question here revolves around when, exactly, the injury-producing event ended.  If, as Defendants contend, the injury-producing event ended at the very latest once the extension cord was cut and Decedent was no longer hanging from the tree, Sh. W. may not recover under <u>Thing</u>.  Sh. W. would be no different that the father and brothers in <u>Fife</u> who only discovered the actual identity of the victim moments after the injury-producing event had already ended.  If, however, the injury-producing event ended at some later point, Sh. W. could still recover.

Naturally, Plaintiffs contend that the injury-producing event continued well after Decedent was cut down from the tree.  However, Plaintiffs' position is unpersuasive for two reasons.  First, Plaintiffs themselves defined the injury-producing event as ending once Decedent was cut down from the tree in

their operative complaint.  (See Doc. 33, Pls.' Second Am. Compl., ¶ 100) ("Plaintiffs were present at the scene of the injury when it occurred . . . .  Plaintiffs were present, witnessed, saw and perceived Decedent hanging from Decedent's neck, choking, while Decedent: (a) was still alive; and (b) *before Decedent was cut down*) (emphasis added).  Second, the only reasonable conclusion that can be drawn from the current record is that the injury-producing event ended once Decedent was cut down and no longer hanging from the tree.  At that point, the injury-producing event was no longer *inflicting* injury on Decedent in much the same way the cooler was no longer *inflicting* injury on the boy in Hathaway once the boy released his hold of the cooler.  The injury-producing event was then fully complete and all that remained to be seen thereafter was the event's consequences.

Because Sh. W. realized that the hanging body was his older brother only *after* Decedent was cut down from the tree, Sh. W. does not satisfy the second Thing requirement.  Sh. W. was not aware *during* the injury-producing event that the victim was a close family member.  See Fife, 232 Cal. App. 3d at 1093.  Accordingly, the Court concludes that Defendants are entitled to summary judgment on Sh. W.'s claim for negligent infliction of emotional distress to a bystander.[6]

**C.     Aware of a Causal Connection to Defendants' Conduct**

Defendants argue that in order to satisfy the second Thing requirement, a plaintiff must prove that she was aware, at the time of injury-producing event, that there was a causal connection between the victim's injuries and the defendant's negligent conduct.  Consistent with this, Defendants contend that Plaintiffs cannot recover for negligent infliction of emotional distress to a bystander because they had no reason to believe at the time of the hanging that Decedent hung himself because of Defendants' alleged negligent conduct (i.e., their failure to protect Decedent from harassment).  Defendants stress that Ms. Walsh did not find Decedent's suicide note, wherein he seemingly blamed Defendants for his suicide, until hours after the hanging.

Defendants rely on two cases as support for their proposition that Thing requires a plaintiff to be aware of a causal connection between the victim's injuries and the defendant's negligent conduct.

---

[6] Furthermore, the Court will enter judgment in Defendants' favor pursuant to Federal Rule of Civil Procedure 54(b).  There is no just reason to delay entering such judgment given the fact that Sh. W.'s claim for negligent infliction of emotional distress to a bystander is (1) his only claim in this case; and (2) is clear and distinct from all the remaining claims in this case.

1   The first case is <u>Bird v. Saenz</u>, 28 Cal. 4th 910 (2002), which involved medical negligence.  At issue

2   were two events identified by the California Supreme Court as potential injury-producing events: (1)

3   the negligent transection of the victim's artery; and (2) the subsequent negligence by the defendants in

4   failing to diagnose and treat the damaged artery.  <u>See id.</u> at 917.  The California Supreme Court ruled

5   that the plaintiffs (the victim's adult daughters) could not recover for negligent infliction of emotional

6   distress to a bystander for either event.  With respect to the negligent transection of the victim's artery,

7   the plaintiffs were not present at, nor did they observe in any way, the injury-producing event.  <u>Id.</u>  As

8   for the defendants' subsequent negligence in failing to diagnose and treat the victim's damaged artery,

9   the plaintiffs did not, and could not, have meaningfully perceived the defendants' negligence.  <u>Id.</u>  The

10  California Supreme Court reasoned that "[e]xcept in the most obvious cases, a misdiagnosis is beyond

11  the awareness of lay bystanders."  <u>Id.</u>  Therefore, even though the plaintiffs may have been physically

12  present during the misdiagnosis, they were not "then aware that it [was] causing injury to the victim."

13  <u>Id.</u> at 922 (quoting <u>Thing</u>, 48 Cal. 3d at 668).

14          The second case on which Defendants rely is <u>Fortman v. Förvaltningsbolaget Insulan AB</u>, 212

15  Cal. App. 4th 830 (Ct. App. 2013).  In <u>Fortman</u>, the plaintiff witnessed the death of her brother while

16  the two were scuba diving.  <u>Id.</u> at 832.  The two were attempting to ascent up to the surface when the

17  plaintiff noticed that her brother was not responsive and appeared to have stopped breathing.  <u>Id.</u> at

18  833.  After the two reached the surface, the brother was taken to the hospital where he was pronounced

19  dead.  <u>Id.</u>  The plaintiff initially believed that her brother had simply had a heart attack.  <u>Id.</u>  However,

20  an investigation into the incident revealed that a plastic flow-restriction insert in the brother's dry suit

21  had malfunctioned and restricted his airflow.  <u>Id.</u> at 832-33.

22          After surveying several cases on the issue, the appellate court held that the plaintiff could not

23  prevail against the defendant (the manufacturer of the malfunctioning plastic flow-restriction insert) on

24  her claim for negligent infliction of emotional distress to a bystander.  In doing so, the court identified

25  the injury-producing event as the malfunctioning of the defendant's defective product, which restricted

26  the brother's ability to breathe underwater.  <u>Id.</u> at 843.  The court then reasoned that while the plaintiff

27  witnessed her brother's death, she was not *then* aware of the causal connection between the death and

28  the injury-producing event (i.e., the defendant's defective product).  <u>Id.</u> at 845.  Instead, the plaintiff

11

was under the impression that her brother had suffered a heart attack.  The court therefore concluded

that the plaintiff could not satisfy the second <u>Thing</u> requirement; the plaintiff did not know at the time

of the injury-producing event that it (i.e., the defendant's defective product) was causing injury to the

victim.  <u>See</u> <u>Fortman</u>, 212 Cal. App. 4th at 843, 845-46.

Defendants' reliance on <u>Bird</u> and <u>Fortman</u> is misplaced.  <u>Bird</u> and <u>Fortman</u> simply apply what

<u>Thing</u> already requires: a plaintiff must be aware at the time of the injury-producing event of a causal

connection between the victim's injuries and *the injury-producing event*.  <u>See</u> <u>Bird</u>, 28 Cal. 4th at 921-

22; <u>Fortman</u>, 212 Cal. App. 4th at 841 n.4 ("[T]he plaintiff must have an understanding perception of

the '*event* as causing harm to the victim.'") (quoting <u>Bird</u>, 28 Cal. 4th at 920) (emphasis added).  <u>Bird</u>

and <u>Fortman</u> do not stand, as Defendants argue, for the much broader proposition that a plaintiff must

be aware of the causal connection between the victim's injuries and *the defendant's negligent conduct*.

<u>See</u> <u>Fortman</u>, 212 Cal. App. 4th at 841 n.4 ("<u>Thing</u> does not require the plaintiff to have awareness of

what caused the injury-producing event[.]").  To the extent that the court's analysis in <u>Bird</u> or <u>Fortman</u>

focused on a defendant's negligent conduct, it was only because the court first identified the negligent

conduct as the injury-producing event, thereby making the two interchangeable.  The two, however, do

not always occur in tandem and are not always synonymous with one another.  And when the two do

diverge, it is the injury-producing event that matters.

<u>In re Air Crash Disaster Near Cerritos, California</u> ("<u>Air Crash</u>"), 967 F.2d 1421 (9th Cir. 1992)

demonstrates this point.  In that case, the plaintiff returned from the grocery store and found her house

engulfed in flames.  <u>Id.</u> at 1422-23.  Although she saw and felt a large explosion minutes earlier, she

did not know at that time that a passenger airline had just collided with a private plane and had crashed

into her house.  <u>Id.</u> at 1423.  As the fire continued to consume her house, the plaintiff was aware that

her husband and two children were still inside and were being seriously injured.  <u>Id.</u>  Indeed, all three

perished in the fire.  <u>Id.</u> at 1422.

The defendant's negligent conduct in <u>Air Crash</u> was distinct from the injury-producing event.[7]

The defendant's negligent conduct was the failure to detect the private plane's intrusion into restricted

---

[7] The defendant was the United States who was responsible for the actions of the air traffic controllers involved in the accident.

1    airspace and the failure to give a traffic advisory to the passenger airline.  See id. at 1423.  The injury-

2    producing event, meanwhile, was the fire that engulfed the house, which killed the plaintiff's husband

3    and children.  See id. at 1425.  In concluding that the plaintiff could recover for negligent infliction of

4    emotional distress to a bystander, the Ninth Circuit focused only on the fire (i.e., the injury-producing

5    event).  The Ninth Circuit reasoned that the plaintiff satisfied the second Thing requirement because

6    she (1) arrived at the scene of the fire while it was still consuming her house; and (2) was at that time

7    aware of the causal connection between *the fire and her husband's and children's injuries*.  See id. at

8    1424-25.  Notably, whether the plaintiff was aware of the actual cause of the fire (i.e., the defendant's

9    negligent conduct) and its ultimate connection with the deaths of her family members was immaterial

10   to the Ninth Circuit's analysis.

11           Another example is Wilks v. Hom, 2 Cal. App. 4th 1264 (Ct. App. 1992).  There, the plaintiff

12   sued her landlord after an explosion and fire killed one of her daughters and seriously injured her two

13   other daughters.  Id. at 1267.  The plaintiff's boyfriend had attached a propane stove to the residence's

14   propane system, which had never been used.  Id.  Shortly thereafter, one of the daughters unplugged a

15   vacuum cleaner inside the house, which triggered an explosion.  Id.

16           In Wilks, the defective propane system constituted the defendant's negligent conduct, whereas

17   the injury-producing event was the explosion itself.  In analyzing whether the plaintiff could recover

18   for negligent infliction of emotional distress to a bystander, the appellate court, like the Ninth Circuit

19   in Air Crash, focused only on the injury-producing event (i.e., the explosion).  The court reasoned that

20   the plaintiff satisfied the second Thing requirement and could recover because (1) she was present at,

21   and personally impressed, by the explosion; and (2) she instantly knew of the likely causal connection

22   between *the explosion and her daughter's injuries*.  See Wilks, 2 Cal. App. 4th at 1271.  The court did

23   not require the plaintiff to have any awareness that the explosion was actually caused by the defective

24   propane system (i.e., the defendant's negligent conduct).

25           Returning to the case at hand, the parties identify Decedent's hanging and suicide as the injury-

26   producing event, which is distinct in time and nature from Defendants' alleged negligent conduct.  The

27   Court therefore finds Air Crash and Wilks to be the most analogous cases.  And just as the plaintiffs in

28   those cases were not required to be aware of the causal connection between the victim's injuries and

13

the defendant's negligent conduct (i.e., the air traffic controllers' mistakes in <u>Air Crash</u> and the faulty propane system in <u>Wilks</u>), Ms. Walsh and Sh. W. need not have been, as Defendants now try to argue in seeking summary judgment, aware of the causal connection between Decedent's act of suicide and Defendants' alleged conduct.  <u>See</u> <u>Fortman</u>, 212 Cal. App. 4th at 841 n.4 ("<u>Thing</u> does not require the plaintiff to have awareness of what caused the injury-producing event[.]").

### D.      Proximate Cause

In addition to the arguments addressed above, the Court raised the issue of proximate cause *sua sponte*.  The Court questioned whether there was enough evidence in the record to establish proximate cause between Defendants' alleged negligent conduct and Decedent's act of suicide.  Specifically, the Court highlighted the fact that there was no evidence in the record, as it then stood, that Decedent had an uncontrollable impulse to commit suicide.  The Court explained that absent such evidence the act of suicide would constitute an intervening and superseding force that would break the chain of causation between Defendants' alleged negligent conduct and Decedent's injuries.  <u>See</u> <u>Corales v. Bennett</u>, 567 F.3d 554, 573 (9th Cir. 2009).

Plaintiffs responded in two ways.  First, they offered a conclusory, and therefore inadmissible, declaration from their expert asserting that Decedent did suffer an uncontrollable impulse to commit suicide.  (<u>See</u> Doc. 52.)  Second, Plaintiffs seemingly invoked language from <u>Tate v. Canonica</u>, 180 Cal. App. 2d 898 (Ct. App. 1960), which suggests that it there may be certain circumstances in which it is unnecessary to prove that the decedent suffered an uncontrollable impulse to commit suicide in order to establish proximate cause:

> We need not and do not now decide whether, in those cases where it would be proper to treat the act of suicide as an independent intervening act because it was truly voluntary, this would still not be a defense if, under the particular circumstances of the case, a truly voluntary suicide was a reasonably foreseeable result of the defendants' wrongdoing.  The usual rule is that the intervening act of a third person does not relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing.  It is arguable that the same rule might apply to the act of decedent.

<u>Id.</u> at 918 (internal quotation marks and citations omitted).

At this point, the Court cannot determine whether this argument has merit, as it touches upon matters that appear to reach outside the scope of the abbreviated and limited briefing requested by the

1   Court.  Therefore, *out of an abundance of caution*, the Court declines at this time to grant Defendants

2   summary judgment *sua sponte* on this issue.  Defendants may re-raise and properly brief this issue in

3   any dispositive motion they elect to file in the future.[8]

4   **IV.     CONCLUSION**

5           Accordingly, for the reasons set forth above, the Court:

6           1.      GRANTS Defendants summary judgment on Sh. W.'s claim for negligent infliction of

7                   emotional distress to a bystander;

8           2.      DIRECTS the Clerk of the Court to enter judgment in favor of Defendants Tehachapi

9                   Unified School District, Susan Ortega, and Paul Kaminski and against Plaintiff Sh. W.

10                  pursuant to Federal Rule of Civil Procedure 54(b);

11          3.      DENIES Defendants summary judgment on Ms. Walsh's claim for negligent infliction

12                  of emotional distress to a bystander; and

13          4.      DECLINES to grant Defendants summary judgment on the issue of proximate cause

14                  *sua sponte*.

15

16

17

18   IT IS SO ORDERED.

19       Dated:    **August 23, 2013**                    **/s/ Lawrence J. O'Neill**
20                                                         UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28   ────────────────
     [8] The deadline for dispositive motions is November 8, 2013.