1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   WENDY WALSH, et al.,                    Case No. 1:11-cv-01489 LJO JLT

11              Plaintiffs,                   ORDER DENYING DEFENDANTS'
                                             MOTION FOR PARTIAL SUMMARY
12        v.                                 JUDGMENT

13   TEHACHAPI UNIFIED SCHOOL
     DISTRICT, et al.,                       (Doc. 57)
14
                Defendants.
15
     _____/
16

17        Now before the Court is Defendants Tehachapi Unified School District ("the School District"),

18   Susan Ortega ("Ms. Ortega"), and Paul Kaminski's ("Mr. Kaminski's") (collectively "Defendants'")

19   motion for partial summary judgment.  Plaintiff Wendy Walsh ("Plaintiff") has filed an opposition to

20   the motion, and Defendants have filed a reply.  The parties have also filed supplemental briefing upon

21   the Court's request.  Having considered the parties' submissions and the entire record in this case, the

22   Court DENIES Defendants' motion for partial summary judgment.

23   I.    BACKGROUND

24        A.    Factual Background

25        This case concerns the apparent suicide of a 13-year-old boy ("Decedent") in September 2010.

26   Plaintiff, the mother and successor in interest of Decedent, maintains that Decedent committed suicide

27   because he was harassed and bullied at school from sixth to eighth grade for being gay.  The following

28   facts regarding this matter are undisputed for the purposes of this motion.

### 1.    Sixth Grade

In early 2009, during Decedent's sixth grade year, a school counselor called Decedent into her office and asked if he had told a friend that he wanted to kill himself.  Decedent did not appear to be upset, spoke matter-of-factly, and indicated that he was just joking.  Decedent explained that he made those comments to his friend because he had recently told his mother and brother that he was gay and they were mad and upset with him.  The counselor told Decedent that he should give his mother and brother some time.  When the counselor met with Decedent three weeks later in a follow-up meeting, Decedent indicated that things at home were going better.  The counselor did not hear any reports that Decedent had thoughts of suicide thereafter.

### 2.    Seventh Grade

During Decedent's seventh grade year, Decedent's friends K.B. and M.W. observed him to be funny and bubbly, and not negative or sad, although he appeared to be less happy than he was during his sixth grade year.  At home, Plaintiff observed Decedent to be happy, bubbly, fun, laughing, and a joy to be around.  Plaintiff did think that Decedent's bullying was taking a mental toll on him, but she did not think that the bullying was making him depressed or suicidal.  When Plaintiff asked Decedent if he wanted to see a counselor, he replied no.

In the summer following Decedent's seventh grade year, a period lasting from approximately June 2010 to August 2010, Plaintiff observed Decedent to be generally happy and positive.  M.W. also observed Decedent to be happy and positive; he was fun, laughed, and wanted to do things.  Decedent told his friend P.J. that he was "happy with his life at the moment."  But the summer was not entirely carefree.  During the first part of summer, Decedent's friends M.W. and Amanda Alford noticed that Decedent had some romantic relationship issues that made him sad or angry sometimes.  Another one of Decedent's friends, Raven Williams, noticed that Decedent would momentarily become quiet when upset about being bullied at school or upon hearing an anti-gay slur, but would quickly become happy again and laugh.

M.W. noticed that Decedent became more negative in late August 2010.  One afternoon in late summer, M.W. said to Decedent while they were at church, "Hey, from what I hear – well, I've heard you talk about, it seems like bullying is pretty hard on you."  M.W. continued, "Have you ever thought

about killing yourself?"  Decedent responded, "Once or twice, but I think it's stupid."  Decedent told M.W. that he had thought of hanging himself in the closet.  M.W. replied, "Oh, okay.  That's not very cool."  Nevertheless, from the way Decedent acted during this conversation (he had a positive outlook, was smiling, and was joking about the matter as if he had grown out of it), M.W. figured it was safe to say that Decedent was *not* going to commit suicide.

### 3.    Eighth Grade

When Decedent started eighth grade, he generally appeared happy to his family and friends, although one friend observed that he did not laugh as much.  He did tell his sister Amanda about two incidents of harassment and bullying at school.  On one occasion, Decedent told his sister that he was called a gay slur.  Amanda could tell that this hurt his feelings for about five minutes, but thereafter he appeared happy and the two were joking.  On another occasion, Decedent told his sister that a student had destroyed his headphones, which made him "really mad."  According to Amanda, however, after the Decedent's anger was momentary.

On September 1, 2010, Plaintiff took Decedent out of school due to bullying concerns and had him put on independent study.  Decedent's sister, Amanda, spent time with Decedent while he was on independent study, and he appeared to be happy.  Decedent told his friend P.J. that he preferred being homeschooled.

### 4.    The Days Just Before the Suicide

On Thursday, September 16, 2010, Decedent spent the afternoon with some friends at a park.  One of Decedent's friends, Amanda Alford, recalled Decedent being his normal self: happy, laughing, and making jokes.  In the evening of Friday, September 17, 2010, Decedent attended a football game with his friends Amanda Alford and Raven Williams.  Decedent then spent the night with some of his friends at Amanda Alford's house.  They watched Disney movies, ate junk food, talked, and stayed up until 3:00 a.m.  According to several friends, Decedent was laughing, making jokes, and seemed to be in good spirits that entire night.

The next morning, Decedent ate pancakes and played video games with his friends.  M.W. had asked Decedent out the night before, but the two "broke-up" via text message.  Nevertheless, Decedent appeared to be happy and was laughing and having fun.  Later that day, Decedent went to the mall and

the park with his friends.  He then spent the night at Amanda Alford's house, where they played pool, ate junk food, and listened to music.

### 5.        The Day of the Suicide

On Sunday, September 19, 2010, Decedent and his friends woke up at 11:00 a.m. at Amanda Alford's home.  They ate and played video games.  Decedent appeared to be sleepy but happy; he was laughing and making jokes.  When Decedent left Amanda's house with Raven Williams later that day, he was frustrated that Plaintiff had declined to give him a ride home, but he otherwise appeared to be normal and happy.

On their way home, Decedent and Raven stopped at a local park.  There, some teenagers harassed Decedent for about 30 minutes.  Decedent called Plaintiff from the park and asked her to pick him up since some boys were trying to beat him up.  Decedent was not crying, and Plaintiff thought he was joking.  She declined to pick him up.  However, five minutes later Decedent called Plaintiff again and this time he was panicking and his tone conveyed that he was serious.  Plaintiff drove to the park, and when she arrived, she had words with the youths who appeared to have been harassing Decedent. Decedent was not crying, his clothes were not disheveled, and he showed no apparent signs of having been battered.  Decedent got into Plaintiff's truck.  Plaintiff asked him if he wanted to call the police. Decedent replied, "I don't care."  Plaintiff asked if he was okay.  Decedent responded that he was all right.  When they arrived home, Decedent declined to talk with Plaintiff about the matter and the two pursued activities in different parts of the house.

Over the next hour or so, Decedent exchanged approximately 36 text messages with Joshua Delarosa, an older gay teenager with whom Decedent had communicated via MySpace, telephone, and text for the last year.  In one of his texts to Joshua, Decedent wrote, "Well. I think im [sic] going to kill myself."  Decedent also texted, "You dont [sic] love me.  You love vince [sic].  Im [sic] going to go. Bye."  (In some prior conversation, Joshua told Decedent that he loved Vince.)  Joshua responded, "I just didnt [sic] want you to keep trying to get at me.  So i [sic] offered sex.  But i [sic] do love you[.]" Decedent replied, "I wont [sic] be texting for long so just text me."  And, "I love you.  And i [sic] hope i [sic] become the universe."  Joshua understood from the texts that Decedent was indicating his intent to commit suicide.  He sent Decedent several texts urging him not to do so.

4

Decedent also exchanged approximately 20 text messages and two brief phone calls with M.W. over the span of 20-30 minutes.  Decedent texted, among other things, "I want all my stuff when this happenes [sic].  Promise me you wont [sic] cry.  And take care of my ipod."  He also texted,  "Please dont [sic] ask puestions [sic].  I want it to be painless for me and you and everyone."  While speaking on the phone with M.W., Decedent cried hysterically.  At some point, M.W. accidentally hung up on Decedent or lost service.  When she eventually was able to call him again, she told him to meet her at the church in 20 minutes.  Decedent agreed.  During the second conversation, Decedent was not crying as bad as before.

Decedent wrote two suicide notes.  One note included the phone numbers of certain friends and read: "Please tell; [S.A.]; I love her [M.W.]; I Love her[.]  Raven + Amanda: I love them.  Yourself: I love you.  Joshua; I was <u>serious</u> + I love him[.]  Everyone else – burn in Hell."  Decedent's other note read, in full:

> Mom; Amanda; Shane; [Sh. W.] I love you.  Thank you for having me.  It's been a pleasure.  I know this will bring much pain.  But, I will hopefully be in a better place than this shit-hole.  Please, put my body in burial. and [sic] visit my used body. and [sic] make sure to make the school feel like shit for brining you this sorrow. this [sic] life was a pleasure, mostly having you guys to pull me through the pain.
>
> Hopefully I become the universe
>
> [Signed Decedent]
>
> Phone 000
>
> Ipod code 0000

The notes, along with Decedent's cellphone and iPod, were placed on a bench in the garage.

Decedent retrieved an extension cord from a box in the garage and a ladder that was tucked in the far corner of the garage.  Both took some effort to retrieve.  Decedent brought the cord and ladder to the backyard and tied the cord to the plum tree.  When Plaintiff walked into the backyard, she found Decedent hanging from the plum tree with the extension cord around his neck.  Decedent was quickly taken to the hospital, but he never regained consciousness.

At no point before this did Plaintiff believe Decedent to be suicidal.  Decedent never expressed to Plaintiff any intent to commit suicide; Decedent was never given mental health counseling for any reason; and Decedent was never committed to an institution for treatment or observation for a mental

1  or emotional disorder.  From what Plaintiff could tell, the other students' treatment of Decedent made

2  him angry and sad at times, but not depressed or suicidal.

3       **B.     Procedural History**

4       Plaintiff first filed suit in Kern County Superior Court.  The action was then removed to this

5  Court on September 2, 2011.  The action is now proceeding on Plaintiff's second amended complaint

6  on the following seven causes of action: (1) failure to prevent student-on-student harassment based on

7  sex or sexual orientation in violation of Title IX of the Education Amendments of 1972 ("Title IX");

8  (2) denial of equal protection in violation of the Fourteenth Amendment; (3) deprivation of familial

9  relations in violation of the First and Fourteenth Amendments; (4) violation of the Unruh Civil Rights

10 Act, Cal. Civ. Code §§ 51 and 51.5; (5) negligence; (6) wrongful death; and (7) negligent infliction of

11 emotional distress to a bystander.

12      On June 7, 2013, Defendants filed a motion for partial summary judgment.  Defendants sought,

13 among other things, partial summary judgment on Plaintiff's cause of action for negligent infliction of

14 emotional distress to a bystander.[1]  In considering the parties' briefing on this matter, the Court began

15 to question whether Plaintiff had sufficient evidence to establish proximate cause between Defendants'

16 alleged conduct and Decedent's suicide to support a claim for negligent infliction of emotional stress

17 to a bystander.  The Court explained that to establish proximate cause between negligent conduct and

18 a suicide, the plaintiff must show that the defendant's negligence caused the suicidal person to suffer

19 an "uncontrollable impulse to commit suicide." Corales v. Bennett, 567 F.3d 554, 573 (9th Cir. 2009).

20 The Court explained that as the record currently stood there was no evidence indicating that Decedent

21 suffered an uncontrollable impulse to commit suicide.  The Court therefore ordered additional briefing

22 and evidence from Plaintiff explaining and showing why summary judgment should not be entered *sua*

23 *sponte* in Defendants' favor on this basis.

24      Plaintiff largely responded by producing a conclusory, and therefore inadmissible, declaration

25 from her expert witness, Dr. Lester M. Zackler ("Dr. Zackler").  Nevertheless, the Court declined to

26

27 ---

[1] Defendants also sought summary judgment on Sh. W.'s claim for negligent infliction of emotional distress to a bystander.  The Court granted the motion on that issue and entered judgment against Sh.

28 W.  As a result, Sh. W. is no longer a plaintiff in this case.

enter summary judgment *sua sponte* in Defendants' favor on the basis of proximate cause.  The Court

noted language in Tate v. Canonica, 180 Cal. App. 2d 898 (Ct. App. 1960), which seemed to suggest

that there may be some circumstances in which it is unnecessary to prove that the decedent suffered an

uncontrollable impulse to commit suicide in order to establish proximate cause in a negligence-based

cause of action:

> We need not and do not now decide whether, in those cases where it would be proper to
> treat the act of suicide as an independent intervening act because it was truly voluntary,
> this would still not be a defense if, under the particular circumstances of the case, a
> truly voluntary suicide was a reasonably foreseeable result of the defendants'
> wrongdoing.  The usual rule is that the intervening act of a third person does not relieve
> the original wrongdoer of liability if the intervening act was a reasonably foreseeable
> result of the original actor's wrongdoing.  It is arguable that the same rule might apply
> to the act of decedent.

Id. at 918 (internal quotation marks and citations omitted).  Given the abbreviated and limited nature

of the Court's request for supplemental briefing, the Court, out of an abundance of caution, declined to

enter summary judgment *sua sponte* in Defendants' favor on the basis of proximate cause.  Instead, the

Court allowed Defendants to re-raise and fully brief this matter in any dispositive motion they elected

to file in the future.

On November 7, 2013, Defendants filed the instant motion for partial summary judgment.  In

the motion, Defendants re-raise the issue of proximate cause and argue that summary judgment should

be entered in their favor on three of Plaintiff's causes of action: (1) deprivation of familial relations in

violation of the First and Fourteenth Amendments; (2) wrongful death; and (3) negligent infliction of

emotional distress to a bystander.  Plaintiff filed an opposition on December 2, 2013, and Defendants

filed a reply and a set of evidentiary objections on December 9, 2013.  Plaintiff filed a response to the

evidentiary objections on December 12, 2013.

On January 15, 2014, the Court requested the parties to provide further briefing on the issue of

reasonable foreseeability.  Plaintiff filed supplemental briefing on January 24, 2014, and Defendants

filed supplemental briefing on January 30, 2014.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any

affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party."  Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); Cecala v. Newman, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party."  Soremekun, 509 F.3d at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  Id. (citing Celotex, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor."  FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect.  Id. at 929.  See also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence."  Soremekun, 509 F.3d at 984.  That remains the province of the jury or

fact finder.  See Anderson, 477 U.S. at 255.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Id.  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## III.   DISCUSSION

This motion presents one question: Is there proximate cause between Defendant's conduct and Decedent's suicide?  Defendants maintain that proximate cause does not exist because the evidence in the current record is insufficient to establish proximate cause under the "uncontrollable impulse" test. Plaintiff disagrees.  Plaintiff also argues that even if she fails to satisfy the uncontrollable impulse test, she may still establish proximate cause under the "chain of causation" test or under general principles of foreseeability.  The Court discusses each argument below.

### A.        Uncontrollable Impulse

Proximate cause, or legal cause, is absent where an intervening act or event breaks the chain of causation between the defendant's conduct and the plaintiff's injuries as a matter of law.  See Conn v. City of Reno, 591 F.3d 1081, 1101 (9th Cir. 2010); Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996); Lombardo v. Huysentruyt, 91 Cal.App. 4th 656, 665-66 (Ct. App. 2001).  Under those circumstances, the defendant is relieved of tort liability even though his alleged conduct may be, from a factual standpoint, a cause of the plaintiff's injuries.  See Conn, 591 F.3d at 1101; Van Ort, 92 F.3d at 837; Lombardo, 91 Cal. App. at 665-66.

In the seminal California case Tate, supra, the court explained that suicide has historically been viewed as an intervening event that *always* breaks the chain of causation, thereby precluding any tort liability for a suicide.  See Tate, 180 Cal. App. 2d at 901-03, 913.  The court also explained, however, that a "modern" exception has emerged where courts have imposed tort liability when the defendant's negligence causes the decedent to suffer from an uncontrollable impulse to commit suicide.  Id. at 913-15.  The underlying reasoning for this exception is that absent volition, the decedent's act of suicide is not independent from the defendant's original negligence.  The court adopted the modern rule, which the court characterized as follows:

9

[W]here the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death.  *On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death.*  Some cases speak of "insanity," and of "delirium or frenzy," and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause.  We think, in the light of modern knowledge as to mental illness, that this view is too narrow.  It should not make any difference that the decedent "knew what he was doing."  If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself.

Id. at 915 (emphasis added).

In other words, if a defendant's negligence causes the decedent to suffer a mental condition in which the decedent cannot control his suicidal impulses, the defendant's negligence is considered the proximate cause of the death and the defendant may be held liable.  If, on the other hand, the decedent was able to control his suicidal impulses and had the ability to refrain from committing suicide if he so desired, then the suicide is deemed a superseding event that breaks the chain of causation between the defendant's negligence and the death.  In that case, the defendant is not liable.

At least one court in this district has also applied this test in the context of a § 1983 claim for deprivation of bodily integrity under the Fourteenth Amendment.  In Soto v. City of Sacramento, 567 F. Supp. 662 (E.D. Cal. 1983), the defendants argued that as a matter of law the plaintiff's own act of attempted suicide constituted a superseding event that released the defendants from all liability for any injuries sustained by the plaintiff due to the suicide attempt.  Id. at 692.  After surveying the state of the law as reflected in the Restatement of Torts and California common law, the district court framed the issue similarly:

[P]laintiff's attempted suicide, if the result of a mental condition proximately caused by defendants' violation of his constitutional rights, which condition prevents him from realizing the nature of his act or controlling his conduct, constitutes an intervening (i.e., one cause) but not a superseding (i.e. sole cause) of plaintiff's injury and thus does not, as a matter of law, break the chain of proximate cause.  *On the other hand, if at the time of the attempted suicide plaintiff was able to appreciate the nature of his act and able to control his conduct, but chose freely to attempt suicide, defendants would not be liable for the injuries sustained by virtue of the attempted suicide.*

Id. at 694 (emphasis added).

///

10

1    Defendants maintain that Plaintiff cannot satisfy the uncontrollable impulse test set forth in

2  Tate and Soto.  Defendants argue that there is no evidence that Defendants caused Decedent to suffer

3  any mental illness or depression.  Defendants stress that Decedent appeared to be happy to his friends

4  and family, and that Decedent never received any emotional or mental health counseling or treatment.

5  Although harassment at school made Decedent angry or sad momentarily, he seemed to return quickly

6  to his happy self after each incident.

7    Defendants also argue that Decedent fully realized the nature and consequences of his decision

8  to commit suicide and had the ability to control his actions.  Defendants highlight the following facts

9  in this regard.  First, before committing suicide Decedent had text message conversations with two of

10 his friends.  These conversations were long (one lasted for as long as an hour), and in them Decedent

11 frankly discussed his intention to commit suicide.  Second, Decedent wrote two detailed suicide notes.

12 The suicide notes contained instructions to bury Decedent's body, apologized for the hurt his actions

13 would likely cause his family, and listed the telephone numbers of those whom Decedent wished to be

14 contacted.  Third, Decedent's suicide plan involved a series of steps: Decedent had to retrieve a ladder

15 tucked in the back of the garage, he had to find an extension cord, he had to tie a noose, he had to take

16 the ladder out to the backyard, and he had to tie the extension cord to a tree branch that would support

17 his weight.  Defendants and their expert, Dr. Charles Scott ("Dr. Scott"), assert that these facts do not

18 demonstrate impulsive or involuntary behavior; rather, to them, it shows that Decedent appreciated the

19 nature of his actions and acted in a rational, deliberate manner.

20    Notably, in Lenoci v. Leonard, 189 Vt. 641 (Vt. 2011), the Supreme Court of Vermont reached

21 a similar conclusion based on roughly similar facts. The court held that there was insufficient evidence

22 to establish that the decedent, a fifteen-year-old girl, had an uncontrollable impulse to commit suicide

23 since the decedent frankly communicated her intention to commit suicide to her friends and family and

24 the decedent executed her suicide plan in a deliberate manner:

25    Here, there was no evidence of an uncontrollable impulse on Alex's part to commit
      suicide.  It was uncontroverted that Alex threatened to commit suicide numerous times
26    in the weeks before her death.  On one occasion, Alex went into detail with her
      boyfriend about how she planned to take her own life.  She spoke about suicide with
27    her mother.  On the night of her suicide, she sent text messages to her friends in which
      she talked about being in trouble with her parents and told her friends goodbye.  Then,
28    while sober, she carried out her suicide plan. This is not evidence of an "uncontrollable

11

1   impulse," but rather of a voluntary, deliberate, and tragic choice by a girl who knew the
    purpose and the physical effect of her actions.

2

3   Id. at 645.  See also Corales v. Bennett, 567 F.3d 554, 573 (9th Cir. 2009) (insufficient evidence of an

4   uncontrollable impulse to commit suicide where the decedent spoke normally with others and wrote a

5   detailed suicide note before committing suicide).

6       The burden therefore shifts to Plaintiff to demonstrate a genuine dispute of fact "by presenting

7   affirmative evidence from which a jury could find in [her] favor."  Stefanchik, 559 F.3d at 929.  In an

8   effort to do this, Plaintiff offers a declaration from Dr. Zackler.  Dr. Zackler opines that Decedent had

9   an uncontrollable impulse to commit suicide when he killed himself due to the fact that (1) he suffered

10  from an "adjustment disorder" and (2) various frontal lobe circuits in the brain, which are involved in

11  controlling and inhibiting behavior, are not fully developed in a thirteen-year-old brain.  Dr. Zackler

12  further opines that "Defendants' negligence" was a "substantial factor" in causing Decedent to suffer

13  from an adjustment disorder:

14          10.     The standard for a thirteen year-old is, and necessarily must be, different than
            for an adult.  As I explained during my deposition: (a) the adolescent brain has not yet
15          matured into the inhibitory capacity of an adult brain; and (b) the various frontal lobe
            circuits, which are not fully developed in the thirteen year-old brain, are predominantly
16          involved in inhibiting behavior.  Decedent's uncontrollable impulse to commit suicide,
            and indeed his suicide, were caused by the combination of: (1) Decedent's adjustment
17          disorder, in which Defendants' negligence was a substantial factor; and (2) Decedent's
            preexisting condition of having a thirteen year-old, relatively anatomically undeveloped
18          immature brain, which rendered Decedent particularly vulnerable and susceptible to
            such adjustment disorder, suicidal ideation, and the commission of suicide.  Both the
19          element of Decedent's adjustment disorder and the element of Decedent's preexisting
            condition of having a thirteen year-old, relatively anatomically undeveloped immature
20          brain were necessary for the resulting suicide; neither alone would have been sufficient.

21          11.     In other words, as a result of the combination of (a) Decedent's adjustment
            disorder, in which Defendants' negligence was a substantial factor, and (b) Decedent's
22          preexisting condition of having a thirteen year-old, relatively anatomically undeveloped
            immature brain, which rendered Decedent particularly vulnerable and susceptible to
23          such adjustment disorder, suicidal ideation, and the commission of suicide, Decedent:
            (1) had an uncontrollable impulse to commit suicide; and (2) did not have the power to
24          control the impulse to commit suicide.

25  (Doc. 62-1, Dr. Zackler Decl. ¶¶ 10-11.)

26      As Defendants' point out, Dr. Zackler's declaration is sparse on factual detail and his opinion

27  regarding causation is conclusory.  Nevertheless, when read alongside Dr. Zackler's expert report and

28  deposition testimony, the declaration creates a genuine dispute as to whether Defendants' actions (or

12

inactions) caused Decedent to suffer from an uncontrollable impulse to commit suicide.  The essence of Dr. Zackler's opinion appears to be that Defendants' failure to discipline and prevent peer bullying and harassment was the primary stressor in causing Decedent to suffer an adjustment disorder, which Dr. Zackler defines as "an emotional reaction to life events . . . [that results] in maladaptive behavior" such as suicide.  (See Doc. 58-3, Dr. Zackler Rule 26 Disclosure, at 8; Doc. 58-33, Dr. Zackler Depo., at 50:15-17; Doc. 62-1 ¶ 10.)  Notably, as support for this position, Dr. Zackler cites medical literature discussing the connection between bullying at school based on one's sexual orientation and psychiatric conditions such as depression and suicidal ideation.  (See Doc. 58-3 at 8-12.)  Dr. Zackler opines that this mental condition, combined with Decedent's inability to control or inhibit his behavior due to his immature frontal lobe, resulted in an uncontrollable impulse to commit suicide.  (See Doc. 58-3 at 12-15; Doc. 62-1 ¶¶ 10-11.)

To be sure, there appear to be, as Defendants argue, weaknesses in Dr. Zackler's opinion.  For example, (1) Dr. Zackler concedes that he cannot be entirely certain of his diagnosis absent "a formal mental status examination" (Doc. 58-33 at 51:6-12); (2) Dr. Zackler concedes that Decedent did not suffer from clinical depression, psychosis, or hallucinations at the time he committed suicide and that he understood the nature of his actions (see Doc. 57 at 401:17-19, 408:8-12, 414:19-415:1); and (3) Dr. Zackler's opinion appears to suggest that all teenagers who suffer from suicidal ideation lack the ability to control their impulses.  But as persuasive as Defendants' arguments may be, they ultimately go to the weight of the evidence, a matter that cannot be decided on summary judgment and one that must be decided by the jury.  See Bieghler v. Kleppe, 633 F.2d 531, 534 (9th Cir. 1980).[2]

**B.     Chain of Causation**

Plaintiff maintains that even if she fails to satisfy the uncontrollable impulse test, she may still establish proximate cause for her § 1983 claims under the more lenient "chain of causation" test.  As support for this proposition, Plaintiff cites and relies solely on Kealoha v. Director, 713 F.3d 521 (9th Cir. 2013).  However, as explained below, Plaintiff's reliance on Kealoha is misplaced and the chain of causation test is irrelevant to this case.

---

[2] Defendants suggest in passing that the harassment on the day of the suicide and the conversation with Joshua Delarosa were the proximate causes of Decedent's suicide.  That issue is also for the jury.

13

The legal issue posed to the Ninth Circuit in <u>Kealoha</u> was this: Under what circumstances may a suicide or suicide attempt be compensable under the Longshore and Harbor Workers' Compensation Act? <u>Id.</u> at 521. This depended on determining the proper standard for causation under the Longshore and Harbor Workers' Compensation Act, specifically, what evidence is required to establish causation between a prior compensable work-related injury and a suicide or suicide attempt. The Ninth Circuit noted that states have generally adopted one of two tests in this regard: the irresistible impulse test or the chain of causation test. <u>Id.</u> at 523-24. The Ninth Circuit explained the difference between the two tests as follows:

> The chain of causation test conditions compensation on "the existence of an unbroken chain of causation from the injury to the suicide." Arthur Larson & Lex K. Larson, 2 Larson's Workers' Compensation Law § 38.03 (2011); <u>see also</u> <u>Bradshaw</u>, <u>supra</u>, 15 A.L.R.3d 616 § 5(a) ("The 'chain-of-causation rule,' succinctly stated, is that where the injury and its consequences directly result in the workman's loss of normal judgment and domination by a disturbance of the mind, causing the suicide, his suicide is compensable."). These states have held that if this chain of causation test is met, the suicide is the product of the work-related injury, and thus not "willful" under their laws. <u>See</u>, <u>e.g.</u>, <u>Petty v. Assoc. Transp., Inc.</u>, 173 S.E.2d 321, 329 (N.C. 1970) ("[A]n employee who becomes mentally deranged and deprived of normal judgment as the result of a compensable accident and commits suicide in consequence does not act wilfully within the meaning of [N.C. Gen. Stat.] § 97-12.").
>
> In contrast, under the irresistible impulse test, an injury is compensable only if a work-related injury causes insanity such that the employee takes his life "through an uncontrollable impulse or in a delirium or frenzy 'without conscious volition to produce death, having knowledge of the physical consequences of the act . . . .'" <u>In re Sponatski</u>, 108 N.E. 466, 468 (Mass. 1915), superseded by statute, Mass. Gen. Laws ch. 152, § 26A (1937). States applying the irresistible impulse test tended to compensate suicides "marked by some violent or eccentric method of self-destruction, while the noncompensable cases usually present a story of quiet but ultimately unbearable agony leading to a solitary and undramatic suicide." Larson & Larson, <u>supra</u>, § 38.02.

<u>Kealoha</u>, 713 F.3d at 524. The Ninth Circuit went on to conclude that while the irresistible impulse test was once the prevailing rule in workers' compensation cases, the chain of causation test should be adopted because that test is in accord with modern understandings of psychiatry and better reflects the Longshore Act's focus on causation rather than fault:

> The irresistible impulse test  was once the "prevailing rule." <u>See</u> <u>Kostelac v. Feldman's, Inc.</u>, 497 N.W.2d 853, 856 (Iowa 1993). But in recent years, states have abandoned that test, refused to adopt it, or interpreted the test to resemble—in practice—a chain of causation test. <u>See</u> Larson & Larson, <u>supra</u>, §§ 38.01, 38.02. These states have found that the chain of causation test better "accord[s] with principles of modern medicine." <u>Vredenburg v. Sedgwick CMS</u>, 188 P.3d 1084, 1090 (Nev. 2008); <u>see also</u> <u>Kostelac</u>, 497 N.W.2d at 856 (noting "society's heightened

14

understanding of mental illness" has led most states to switch to chain of causation test); Borbely v. Prestole Everlock, Inc., 565 N.E.2d 575, 579 (Ohio 1991) (finding chain of causation test "more logical and enlightened"). As these states recognize, whether an employee committed or attempted suicide in a "delirium or frenzy" has no bearing on whether a work-related injury caused the suicide. See Borbely, 565 N.E.2d at 578 ("In our view, simply because a person is capable of having a fixed purpose to commit suicide does not necessarily mean that the resulting suicide is voluntary.").

\* \* \*

Given the best-reasoned modern trend of case law, we hold that a suicide or injuries from a suicide attempt are compensable under the Longshore Act when there is a direct and unbroken chain of causation between a compensable work-related injury and the suicide attempt. The claimant need not demonstrate that the suicide or attempt stemmed from an irresistible suicidal impulse. The chain of causation rule accords with our modern understanding of psychiatry. It also better reflects the Longshore Act's focus on causation, rather than fault. See 33 U.S.C. § 904(b) ("Compensation shall be payable irrespective of fault as a cause for the injury.").

Kealoha, 713 F.3d at 524-25.

Plaintiff points to the language above, particularly the language exalting the chain of causation test as being in accord with modern medicine, and argues that the Ninth Circuit has endorsed the chain of causation test for use in *all* federal causes of action. To the extent that the Ninth Circuit stated that the chain of causation test "better reflects the *Longshore Act's* focus on causation, rather than fault," id. at 525 (emphasis added), Plaintiff maintains that that language "was tertiary" and "is no reason to distinguish the case or limit it to the Longshore Act." (Doc. 58 at 18.)

The Court disagrees. Kealoha, a workers' compensation case under the Longshore Act, cannot be read broadly and applied to Plaintiff's § 1983 claims. Section 1983 claims are a species of tort law, which is predicated upon fault. See City of Monterey v. Del Monte Dunes, 526 U.S. 687, 709 (1999); Hildebrandt v. Illinois Dep't of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003). In contrast, workers' compensation is premised on liability *without fault*. See Claxton v. Waters, 34 Cal. 4th 367, 373 (2004) ("Liability under the workers' compensation law is founded in neither tort nor contract law. Instead, it is liability without fault[.]") (citations omitted). Its underpinning is the compensation bargain," in which "[t]he employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." Shoemaker v. Myers, 52 Cal. 3d 1, 16 (1990). See Pedroza v. BRB, 624 F.3d 926, 933 (9th Cir. 2010). Applying workers' compensation's no-fault

concepts of causation to Plaintiff's § 1983 claims would therefore eviscerate the fault-based theory of recovery that § 1983 claims and other tort actions are supposed to embody.  See Cleveland v. Rotman, 297 F.3d 569, 572 n.1 (7th Cir. 2002) (noting that plaintiff's reliance on workers' compensation cases to show proximate cause in a tort action involving suicide is misplaced because only factual causation need be established in workers' compensation cases); Clift v. Narranganett Television, L.P., 688 A.2d 805, 810 n.4 (R.I. 1996) (noting that worker's compensation's "more liberal" standard of causation as to suicide "has not been embraced by any court outside the workers' compensation field because the fault concept, so central in [tort] cases, is absent and not essential in [worker's compensation] cases"); Accordingly, the Court concludes that Kealoha and the chain of causation test have no application to Plaintiff's § 1983 claims.

### C.      Special Relationship and Foreseeability

Finally, Plaintiff contends that ordinary principles of foreseeability should govern her state law negligence-based claims on the issue of proximate cause.[3]  As support for her position, Plaintiff cites C.A. v. Williams S. Hart Union High School Dist., 53 Cal. 4th 861 (2012), among other cases, for the proposition that under California law, "a school district and its employees have a special relationship with the district's pupil's[.]"  Id. at 869.  Plaintiff suggests that because of this special relationship, a school district and its employees have a duty to supervise the conduct of students on school grounds and have an affirmative duty to take reasonable measures to protect its students.  J.H. v. Los Angeles Unified School Dist., 183 Cal. App. 4th 123, 139-43 (Ct. App. 2010).

As a preliminary matter, simply citing cases that establish a school district and its employee's duty of care is of no aid to Plaintiff.  It has already been presumed for the purposes of this motion that Defendants owed a duty of care to Decedent and that Defendants breached this duty by failing to stop, remedy, and prevent the in-school harassment and bullying of Decedent.  It is also undisputed for the purposes of this motion that it was foreseeable that this breach would cause Decedent to suffer mental

---

[3] The Court confines Plaintiff's "foreseeability" argument to her state law negligence-based claims for two reasons.  First, Plaintiff cites only to California negligence cases and fails to provide any federal authority on the issue.  Second, the "special relationship" theory on which Plaintiff relies is plainly not applicable in the context of her § 1983 claims.  See Patel v. Kent Sch. Dist., 648 F.3d 965, 971-74 (9th Cir. 2011) (as a constitutional matter, a school does not have a special relationship with its students).

or emotional distress.  Given these circumstances, the question then became the sufficiency of the link between Decedent's mental or emotional distress and his ultimate injury: his suicide.  This led to the Court's discussion of <u>Tate</u>, the historical view that suicide constitutes an intervening event that always breaks the chain of causation and precludes tort liability for the suicide, and the exception provided by the uncontrollable impulse test.  (<u>See</u> <u>supra</u> Section III.A.)

Although far from clear due to the lack of meaningful discussion by Plaintiff, it is possible that Plaintiff may be attempting to argue something more.  Plaintiff might be arguing that Defendants had a specific duty to prevent a foreseeable suicide due to the special relationship between Defendants and Decedent. <u>See</u> <u>Nally v. Grace Community Church</u>, 47 Cal. 3d 278, 293 (1988) (recognizing that a duty to prevent a foreseeable suicide may arise if there is a special relationship between the parties).  Courts have widely recognized that a breach of this specific duty may result in tort liability for a suicide, even if the suicide was volitional and does not satisfy the uncontrollable impulse test:

> As a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact, is responsible for the harm.  In recent years, however, tort actions seeking damages for the suicide of another have been recognized under two exceptions to the general rule; namely, where the defendant is found to have actually caused the suicide, or where the defendant is found to have had a *duty to prevent* the suicide from occurring.
>
> * * *
>
> The first exception involves cases where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act.
>
> * * *
>
> The second exception focuses on the existence of a specific duty of care to prevent suicide.  This duty has been imposed as a matter of law on essentially two classes of defendants, both of whom are held to have a special relationship with the suicidal individual.

<u>McLaughlin v. Sullivan</u>, 123 N.H. 335, 337-38 (N.H. 1983) (emphasis in original) (citations omitted). <u>Accord</u> <u>Rollins v. Wackenhut Serv.</u>, 703 F.3d 122, 127-128 (D.C. Cir. 2012); <u>Lenoci</u>, 189 Vt. at 645; <u>Clift</u>, 688 A.2d at 809-10; <u>Lee v. Corregedore</u>, 83 Haw. 154, 160 (H.I. 1996); <u>Eisel v. Board of Educ. of Montgomery County</u>, 324 Md. 376, 381 (M.D. 1991).[4]

---

[4] This appears to be the exception the <u>Tate</u> court alluded to when it stated, in dicta:

17

Courts generally have imposed a duty to prevent suicide only where the defendant has physical custody and substantial control over a person, or where the defendant has special training or expertise in mental illness and has sufficient control over a person to prevent the suicide.  See Rollins, 703 F.3d at 127; McLaughlin, 123 N.H. at 338.  The typical defendant is a prison, jail, or hospital.  Lenoci, 189 Vt. at 645; see, e.g., Murdock v. City of Keene, 137 N.H. 70 (N.H. 1993) (jail); Meier v. Ross General Hospital, 69 Cal. 2d 420 (1968) (hospital).  It is widely acknowledged that under those circumstances the defendant has a custodial relationship over others that uniquely places the defendant in a position to detect and prevent suicide.

It is unclear whether a duty to prevent suicide could similarly be imposed on a school.  Plaintiff fails to cite, and the Court has not independently found, any California case explicitly imposing a duty to prevent suicide on a school district or its employees.  Cf. Nally, 47 Cal. 3d at 299 (indicating that a duty to prevent suicide has "heretofore" only been imposed on psychiatrists and hospitals caring for suicidal patients).  Nonetheless, a strong argument can be made that the same reasoning that California courts have emphasized with respect to the special relationship between a school and its students also supports the imposition of a duty to prevent suicide.  The special relationship between a school and its students is premised on the idea that school personnel stand *in loco parentis* to their students and have authority to exercise "comprehensive control" over them.  C.A., 53 Cal. 4th at 869; Hoff v. Vacaville Unified School Dist., 19 Cal. 4th 925, 935 (1998); Rodriguez v. Inglewood Unified School Dist., 186 Cal. App. 3d 707, 714 (Ct. App. 1986).  Schools are expected to take "all reasonable steps" to protect its students from harm.  J.H., 183 Cal. App. 4th at 142 (quoting M. W. v. Panama Buena Vista Union School District, 110 Cal. App. 4th 508, 517 (Ct. App. 2003)).  This is especially true where, as here, the school is placed in charge of minors, who by definition cannot care for themselves.

---

We need not and do not now decide whether, in those cases where it would be proper to treat the act of suicide as an independent intervening act because it was truly voluntary, this would still not be a defense if, under the particular circumstances of the case, a truly voluntary suicide was a reasonably foreseeable result of the defendants' wrongdoing.

180 Cal. App. 2d at 918.  To the extent that this language could be read to mean something broader, at least one court has indicated that such a reading "apparently has not been adopted by any jurisdiction." Porter v. Murphy, 792 A.2d 1009, 1014 (Del. 2001).

1    Still, any finding that a school has a duty to prevent suicide must remain cognizant of the fact

2  that, unlike medical professionals, school personnel generally are not trained in detecting or treating

3  mental illness.  Cf. Mikell v. School Admin. Unit #33, 158 N.H. 723, 732-33 (N.H. 2009) (declining

4  to impose duty to prevent suicide on school counselor despite the fact that New Hampshire recognizes

5  a special relationship between schools and its students); Eisel, 324 Md. at 381-86 (imposing a duty to

6  prevent suicide on school counselor only after emphasizing that the relationship between the counselor

7  and the student had "therapeutic overtones" and that the counselor was trained in suicide intervention).

8  Thus, assuming that this factor does not preclude a finding of duty altogether, it must be assumed that

9  California courts would not hold a school and its employees to a higher standard of care than medical

10 professionals, who are trained in diagnosing mental illness.  In California, medical professionals have

11 a duty to take reasonable steps to prevent suicide if (1) they are charged with the care of a patient and

12 (2) they "know of facts from which they could reasonably conclude that the patient would be *likely* to

13 harm himself in the absence of preventative measures."  Meier, 69 Cal. 2d at 424 (emphasis added).

14 See also Vistica v. Presbyterian Hospital & Medical Center, Inc., 67 Cal. 2d 465, 469 (1967); Wood v.

15 Samaritan Institution, Inc., 26 Cal. 2d 847, 853 (1945); Bellah v. Greenson, 81 Cal. App. 3d 614, 619-

16 20 (Ct. App. 1978).[5]

17    Jacoves v. United Merchandising Corp., 9 Cal. App. 4th 88 (Ct. App. 1992), the only case of

18 substance that Plaintiff cites on this matter, is illustrative.  In Jacoves, a 20-year-old man committed

19 suicide 11 days after a hospital discharged him from its care.  The plaintiffs claimed that the hospital's

20 decision to discharge their son was negligent and was a proximate cause of the suicide.  The court held

21 that the plaintiffs could maintain their wrongful death action against the hospital.  The following facts

22 were allegedly within the hospital's knowledge, facts from which the hospital could have reasonably

23 concluded that the man was likely to commit suicide in the absence of preventative measures: (1) the

24 decedent had a history of major depression; (2) the decedent was admitted to the hospital because he

25

26 ─────────────────
   [5] Notably, courts that have imposed a duty to prevent suicide in the prison or jail context have applied
27 the same standard.  See Murdock, 137 N.H. at 73 ("Unless the jailer has actual knowledge of facts
   indicating that the prisoner is *likely* to commit suicide, the prisoner's intentional, intervening act [of
28 committing suicide] will preclude a finding that the jailer's breach of duty is the proximate cause of
   the prisoner's harm.") (emphasis added).

had just attempted to commit suicide by overdosing on non-prescription medication; (3) the decedent was diagnosed at the hospital as having a "major depressive disorder, recurrent in a schizoid paranoid personality with suicidal potential and ideation;" (4) the decedent was placed under the direct care of a psychiatrist; and (5) upon being discharged from the hospital, the decedent commented to a psychiatric aid that he doubted he could refrain from committing suicide.  Id. at 97-99.

Plaintiff's evidence in this case stands in sharp contrast with the facts in Jacoves.  As evidence, Plaintiff points to the conversation that Decedent had with a school counselor, wherein he admitted to the counselor that he told a friend that he wanted to kill himself.  This conversation is not much help to Plaintiff.  It preceded the suicide by over a year and a half, and there is no evidence that Ms. Ortega or Mr. Kaminski ever knew about it.  Moreover, when Decedent spoke to the counselor, he spoke matter-of-factly, did not appear to be upset, and stated that he was just joking when he made those comments.  To the extent that Decedent was mad, it was because *his family* was upset with him for being gay, not because of any bullying at school.  Most critically, the counselor followed-up with Decedent in a 15 to 20-minute meeting three weeks later. In that meeting, Decedent indicated that things were going better at home.  Thereafter, the counselor did not hear of anything suggesting that Decedent was considering committing suicide.  None of this suggests that suicide was *likely*; if anything, it shows that the school properly discharged its duties.

Plaintiff's other evidence includes the deposition testimony of several school personnel.  They all testified that they consider bullying a safety issue and recognize that bullying can result in physical or psychological harm.  (See Doc. 64-5, Swanson Depo., at 37:6-24; Doc. 64-4, Ortega Depo., at 48:2-49:12; Doc. 64-12, Kaminski Depo., at 22:7-23.)  These statements are unremarkable.  No one would dispute that harassment at school can cause physical or emotional harm.  The relevant question here is much more specific; it concerns the likelihood of *suicide* as a result of bullying.  Plaintiff's deposition excerpts offer no insight on this matter.

Dr. Zackler attempts to address this issue in his supplement declaration. Dr. Zackler maintains that Decedent's suicide was reasonably foreseeable because Defendants knew of, but failed to remedy, Decedent's harassment at school and that medical research has shown that suicide attempts are greater in gay teens and young adults. (Doc. 64-2, Dr. Zackler Decl. ¶¶ 9-10.)  There are two key flaws with

this.  First, nothing suggests that Ms. Ortega or Mr. Kaminski have any training or expertise in suicide.  It is therefore inappropriate to argue that they should have known that Decedent was suicidal because a trained psychiatrist has testified, post-suicide, that the suicide was reasonably foreseeable.  Second, Dr. Zackler opines on suicide in gay teens in the abstract and offers little insight as to why *Decedent* was so likely to commit suicide and why it should have been apparent to Defendants.  This is probably because he cannot.  Decedent never sought or received any mental health counseling or treatment as a result of being bullying.  By all accounts, from friends and family alike, Decedent generally appeared to be happy despite being bullied at school.

It is telling that Plaintiff, who was as aware of the bullying at school as anyone else, conceded that she herself never thought that Decedent was depressed or suicidal.  A juror would be hard-pressed to turn around and find that Defendants knew any better.  Accordingly, the Court finds that assuming Defendants had a duty to prevent a foreseeable suicide, Plaintiff's evidence is insufficient to show that Defendants breached that duty.

## IV.   CONCLUSION

In sum, the Court finds that there are genuine issues of material fact as to whether Defendants' conduct was the proximate cause of Decedent's suicide.  Specifically, there is a factual question as to whether Defendants' conduct caused Decedent to suffer an uncontrollable impulse to commit suicide.  Accordingly, Defendants' motion for partial summary judgment is DENIED.

IT IS SO ORDERED.

Dated:   __February 4, 2014__              _____/s/ Lawrence J. O'Neill_
                                          UNITED STATES DISTRICT JUDGE